IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANTHONY THOMAS DELONG, | ) | CASE NO.  1:21-CV-00493-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) | |

Plaintiff, Anthony Thomas DeLong ("Plaintiff" or "DeLong"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act,42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

## I.  PROCEDURAL HISTORY

In May 2018, DeLong filed an application for POD and DIB, alleging a disability onset date of April 14, 2014 and claiming he was disabled due to: epilepsy; anxiety; depression; slurred speech;

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

imbalance; shakiness; memory loss; headaches; difficulty holding things and writing; and trouble walking. (Transcript ("Tr.") at 15, 67-68, 87.)  The application was denied initially and upon reconsideration, and DeLong requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On May 5, 2020, an ALJ held a hearing, during which DeLong, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On June 15, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-32.)  The ALJ' s decision became final on January 4, 2021, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On March 2, 2021, DeLong filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 17-18.)  DeLong asserts the following assignments of error:

(1) The ALJ failed to properly evaluate the medical opinion evidence consistent with Agency authority and 6th Circuit precedent.

(2) The ALJ's credibility assessment is generally defective because of the above error, and specifically so because he neglected to consider Plaintiff's stellar work history.

(Doc. No. 12 at 1.)[2]


## II.    EVIDENCE

### A.    Personal and Vocational Evidence

DeLong was born in February 1976 and was 44 years-old at the time of his administrative hearing (Tr. 15, 30), making him a "younger" person under Social Security regulations.   *See* 20 C.F.R. §

---

[2] DeLong withdrew a third assignment of error in his reply brief.  (Doc. No. 18 at 1.)

404.1563(c).  He has at least a high school education and is able to communicate in English.  (Tr. 31.)  He has past relevant work as a loan officer, financial services sales representative, and sales clerk.  (*Id.* at 30.)

## B.    Relevant Medical Evidence[3]

On September 16, 2013, DeLong saw Jonathan Beary, DO, PGY-V, for a neurological evaluation.  (*Id.* at 354.)  DeLong reported déjà vu episodes followed by nausea, sweating, and lightheadedness that began in 2001.  (*Id.*)  DeLong told Dr. Beary that his déjà vu episodes had not improved on his current medication, occurring once every three weeks and mostly when DeLong was tired, nervous, or stressed.  (*Id.*)  These episodes lasted from 30 minutes to an hour and usually occurred in the late afternoon.  (*Id.*)  On examination, Dr. Beary found full orientation, normal recent and remote memory, normal attention span and concentration, normal language, normal fund of knowledge, and mildly dysarthric speech.  (*Id.* at 356.)

On December 5, 2013, treatment providers admitted DeLong for continuous video EEG monitoring and sphenoidal electrode insertion.  (*Id.* at 342.)  Treatment providers noted 13 typical auras/seizures were recorded.  (*Id.* at 344.)  DeLong reported two different types of seizures: "psychic aura seizures" that occurred one to three times a week, lasting two to five minutes, and that are brought on by stress and fatigue; and tonic clonic seizures which consisted of convulsions in his sleep.  (*Id.* at 320.)  After his seizures, DeLong reported fatigue, problems concentrating, and being "'shot for the day.'"  (*Id.* at 323.)  Treatment providers adjusted DeLong's medications and he was discharged home in good

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As DeLong challenges only the ALJ's mental findings, the Court further limits its discussion of the evidence to DeLong's mental impairments.

condition on December 10, 2013.  (*Id.* at 342-44.)  DeLong's diagnoses consisted of focal epilepsy, gait disturbance, and anxiety.  (*Id.* at 342.)

On April 21, 2014, DeLong saw Firdaws Laryea, PA-C, for follow up regarding his seizures.  (*Id.* at 298.)  DeLong reported having two to three auras per week and the last witnessed convulsive seizure was in August 2013 at work.  (*Id.* at 299.)  DeLong further reported mild improvement in ataxia but continued coordination issues, including two falls, as well as stumbling, staggering, slurred speech, difficulty concentrating, and difficulty communicating, although these episodes were "in relation to him drinking alcohol."  (*Id.*)  He also acknowledged that he had not been taking his seizure medication consistently and that he was concerned regarding the cost of the medication.  (*Id.*)  DeLong's wife reported bizarre behavior and emotional outbursts, and DeLong reported that he was not taking Celexa as prescribed.  (*Id.*)  On examination, Laryea found DeLong alert and able to follow one and two step commands, and he exhibited fluent speech without anomia or paraphasic errors as well as normal memory. (*Id.* at 301.)  Laryea further found mild action tremors bilaterally, no dysmetria with finger to nose testing, mild ataxic gait with some jerking movements, the ability to tandem walk with some difficulty, and swaying with Romberg testing.  (*Id.* at 302.)  Laryea ordered a trial of a new seizure medication and weaning off the old seizure medication because of cost, continuing Celexa, and following up with psychiatrist George Tesar, M.D.  (*Id.*)

On August 1, 2014, DeLong saw Laryea for follow regarding his seizures.  (*Id.* at 294.)  DeLong reported he was feeling better on Depakote; he had not had any seizures since starting the medication and his anxiety had improved, although he still described a lot of nervous energy.  (*Id.* at 294-95.)  On

4

examination, Laryea found DeLong fully oriented with the ability to follow one and two step commands and fluent speech with no anomia or paraphasic errors.  (*Id.* at 296-97.)

On October 9, 2014, Laryea spoke with DeLong over the telephone.  (*Id.* at 293-94.)  Laryea noted:

> Overall pt reports he is doing well, some isolated auras if sleep deprived but overall much better.  He is not interested in trial to increase VPA as he feels auras are infrequent and triggered by poor sleep.  Balance and gait have greatly improved.  Went to Michigan a few weeks ago and was able to climb the stairs without difficulty.  Reports that he has cut back on alcohol and he admits that this has been the greatest factor in his seizures as [sic] gait imbalance.

(*Id.* at 294.)

On July 27, 2018, DeLong saw Silvia Neme-Mercante, M.D., at the Cleveland Clinic Epilepsy Center.  (*Id.* at 467.)  Dr. Neme-Mercante reviewed DeLong's 2013 EEG date and noted 10 recorded seizures, although the data was notable in that "there were no interictal abnormalities recorded."  (*Id.* at 468.)  DeLong reported continued aura seizures one to seven times a month, rare déjà vu seizures (last one had occurred a year ago), and convulsive seizures when sleeping that he had once a year or less.  (*Id.* at 468-69.)  However, DeLong lived by himself and there was a concern that his seizure frequency might be underestimated as a result.  (*Id.* at 469.)  DeLong reported being confused all the time.  (*Id.*)  DeLong told Dr. Neme-Mercante he was off his seizure and anxiety medication as he had run out of refills three weeks ago and wanted to see what would happen with his seizures.  (*Id.*)  Dr. Neme-Mercante noted that the progression of DeLong's bulbar speech and ataxic gate, as well as his confusion, was "concerning."  (*Id.* at 470.)  Dr. Neme-Mercante wanted to admit DeLong for evaluation and restart his seizure medication.

(*Id.*)  DeLong preferred not to be admitted, so Dr. Neme-Mercante recommended he restart his seizure medication and scheduled admission for the next Monday per DeLong's request.  (*Id.*)

On July 30, 2018, DeLong underwent a consultative psychological evaluation by Mitchell Wax, Ph.D.  (Tr. 475.)  DeLong reported the main reason he could not work was because of his medical problems, including epilepsy.  (*Id.* at 476.)  DeLong told Dr. Wax he had daily mini-seizures, and a result he had memory and balance problems.  (*Id.*)  He also reported body pain, headaches, speech problems, and frequent fatigue.  (*Id.*)  DeLong told Dr. Wax he took medication for his seizures.  (*Id.*)  He did not receive counseling.  (*Id.*)  DeLong lived alone in a duplex.  (*Id.*)  DeLong reported difficulty staying asleep, but he did not nap during the day.  (*Id.* at 477.)  He did not cook; he microwaved his food.  (*Id.*)  He reported doing the dishes every few days and cleaning the house by himself every two weeks, although it was a struggle.  (*Id.*)  DeLong paid his neighbor to do his laundry.  (*Id.*)  He spent time reading books and reading on the internet, he watched TV, he visited with his neighbor for an hour a day, went grocery shopping by himself once a week, and visited with his children weekly.  (*Id.* at 477-78.)  He had four or five friends he talked to weekly, and he also spoke weekly to his brother.  (*Id.* at 478.)  He could take public transportation by himself.  (*Id.*)

On examination, Dr. Wax found intermittent memory problems, slurred speech, and word salad and word search problems.  (*Id.*)  Dr. Wax noted while DeLong's speech was initially logical, coherent, and goal-directed, he spoke with slurred speech and Dr. Wax had to ask him to repeat himself several times when he was not understandable.  (*Id.*)  Dr. Wax found that DeLong "deteriorate[d] as the session progressed due to fatigue," and that as DeLong tired, "word search problems[] and word salad problems became more evident."  (*Id.*)  DeLong described his mood as content, but he appeared sad and a little

6

anxious.  (*Id.*)  Dr. Wax noted significant differences in intelligence and memory testing scores, which indicated "possible organic problems," and that DeLong's fatigue may have affected some of his scores. (*Id.* at 479.)  Dr Wax stated:

> There was evidence of mental confusion, especially as he deteriorated due to fatigue.  His ability to concentrate was initially good, but became poor as he tired. . . .His flow of conversation was marginal, due to significant speech problems.  He claimed his speech problems are a result of his seizure disorder. As he tired, word search problems and word salad were noted.  On Digit Span he could recall eight digits forward and seven digits backward.  He could remember all three of three simple words on a recognition task after approximately five minutes.  He was able to add by 3s to 40, and could subtract 7s from 100.

(*Id.*)  Dr. Wax noted DeLong "struggle[d] to live independently." (*Id.*)  Dr. Wax opined DeLong would be able to understand, remember, and carry out instructions based on his IQ testing and work history, but that intermittent memory problems were noted.  (*Id.* at 481.)  Dr. Wax further opined DeLong would have difficulty maintaining attention and concentration due to his intermittent memory problems.  (*Id.*) DeLong tired quickly, and as he tired, he experienced cognitive problems, including poor speech and poor ability to process information.  (*Id.*)  Dr. Wax further opined DeLong would not have difficulty responding appropriately to supervisors and coworkers, but DeLong would not respond appropriately to work pressures in a work setting because of his quick fatigue and more pronounced cognitive problems that occurred as he tired.  (*Id.*)

On November 30, 2018, DeLong spoke to Joyce Soroka, RN, at the Cleveland Clinic reporting he had aura seizures twice a week and asking if he needed to have the EMU admission discussed at his July appointment with Dr. Neme-Mercante.  (*Id.* at 662.)  Soroka told him he should keep his EMU admission appointment and forwarded his request to scheduling.  (*Id.* at 663.)

7

From December 27, 2018, through January 4, 2019, DeLong again underwent continuous EEG monitoring at the hospital for his seizures.  (*Id.* at 651-52.)  Examination on admission revealed full orientation, bulbar speech, drooling, and ataxic gait.  (*Id.* at 490.)  DeLong reported having déjà vu one to three times per week, unresponsive episodes one to two times per month, and generalized tonic clonic seizures once every four to six months.  (*Id.* at 491.)  DeLong had started Trileptal in July 2018 for his seizures; although the medication helped, his seizures continued.  (*Id.*)  A physical examination at discharge revealed full orientation, the ability to follow one and two step commands, moderate dysarthric speech, and moderate dysmetria with finger nose testing bilaterally.  (*Id.* at 652.)  A mental status examination that day revealed intact memory, anxious mood, normal speech/language except for some dys-articulation, poor insight, and grossly intact judgment.  (*Id.* at 649-50.)  DeLong could count backward from 100 by serial sevens.  (*Id.* at 649.)

On February 13, 2019, DeLong saw neurologist Ilia Itin, M.D., for a neurological consultation. (*Id.* at 751.)  Delong reported anxiety and memory problems, although he denied having problems with daily life.  (*Id.*)  DeLong described an unsteady gait, dysarthria, and poor writing.  (*Id.*)  On examination, Dr. Itin found normal language and cognition, although no formal cognitive testing was done, abnormal finger to nose coordination, dysarthric speech, mild to moderate impairment in f-f and f-n, and impaired dysdiadochokines ia.  (*Id.* at 752.)  Dr. Itin noted DeLong's depression scores were "fairly high."  (*Id.* at 753.)

On April 17, 2019, DeLong saw Khoon Ghee Queenie Tan, M.D., Ph.D., for consultation at the Cleveland Clinic Medical Genetics Clinic.  (*Id.* at 720.)  DeLong reported worsening dysarthria, although he had not scheduled speech therapy, and worsening cognition and memory, resolved anxiety, and fatigue

8

that he attributed to his medication.  (*Id.*)  Dr. Tan noted the 2018-2019 EEG was abnormal; although it was "inconclusive with regards to [DeLong's] current spells as no typical events were captured," interictal EEG showed "rare intermittent slowing over the right temporal region."  (*Id.* at 722-23.)  Dr. Tan noted the video EEG "provides evidence for right hemisphere focal epilepsy" and the lack of interictal findings "raise a concern for extratemporal lobe onset."  (*Id.* at 723.)  On examination, Dr. Tan found full orientation, dysarthria, dysmetria with finger to nose coordination, mild dysdiadochokines ia in rapid alternating movements, and a "somewhat flat" affect.  (*Id.* at 727.)

On May 3, 2019, DeLong saw Dr. Neme-Mercante for follow up.  (*Id.* at 772.)  Dr. Neme-Mercante noted no seizures were captured in the 2018-2019 EEG.  (*Id.*)  DeLong reported he had not any seizures since he started his medication in July, but he had been diagnosed with progressive cerebellar ataxia and was undergoing an extensive evaluation for that diagnosis.  (*Id.*)  On examination, Dr. Neme-Mercante found full orientation, the ability to follow one and two step commands, bulbar speech, and ataxia.  (*Id.* at 774.)

On May 8, 2019, DeLong saw Dr. Itin for follow up.  (*Id.* at 770.)  DeLong reported he continued to be seizure free, and he continued to feel depressed.  (*Id.* at 771.)  On examination, Dr. Itin found DeLong somewhat drowsy with mildly dysarthric speech.  (*Id.*)  DeLong reported seeing "visual auras" during the examination.  (*Id.*)

On February 20, 2020, DeLong saw Dr. Itin for follow up.  (*Id.* at 807.)  DeLong reported no general tonic clonic seizures since his medication had been adjusted.  (*Id.*)  DeLong reported cognitive difficulties, including frequently forgetting things and needing to use phone reminders, anxiety, and significant speech problems that were noted as stable.  (*Id.* at 808.)  On examination, Dr. Itin found full

9

orientation, intact memory, normal speech, fluent language with no aphasia, end-gaze nystagmus bilaterally, some coordination difficulties, and some bradykinesia, which Dr. Itin noted was "mainly due to difficulty with coordination."  (*Id.* at 809.)  DeLong's depression was "partially responsive" to medication. (*Id.*)

On March 11, 2020, DeLong saw Kim Memer, RN, for follow up.  (*Id.* at 839.)  DeLong reported déjà vu seizures two to three times a week, and he had had one that day.  (*Id.*)  DeLong told Memer his mood was good.  (*Id.*)  DeLong reported his aura seizures had lessened in frequency since adding his medication, but he continued to have aura seizures two to three times a week.  (*Id.* at 840.)  Memer directed DeLong to log his seizures in a calendar.  (*Id.*)

## C.    State Agency Reports

On August 15, 2018, Leslie Rudy, Ph.D., found moderate limitations in DeLong's ability to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage oneself.  (*Id.* at 73, 75.)  Dr. Rudy opined DeLong could understand and remember two to three step tasks, carry out one to three step tasks in a setting without demands for unusually fast pace or high production, interact on an occasional and superficial basis, and adapt to occasional changes in a relatively static work setting.  (*Id.* at 80-81.)  Lynne Torello, M.D., also opined that because of his slurred speech, DeLong would "work best in an environment that required minimal communication." (*Id.* at 78.)

In January 2019, Carl Tishe, Ph.D., and Michael Lehv, M.D., affirmed these findings on reconsideration.  (*Id.* at 93, 97-98, 99-101.)

10

**D.    Hearing Testimony**

During the May 5, 2020 hearing, DeLong testified to the following:

- As of April 2014, his symptoms of epilepsy, balance issues, pain in his legs and arms, and migraine headaches were getting worse.  (Tr. 43.)  These symptoms affected his sleep and his balance, interfered with walking, activities of daily living, being out in public, and going up and down stairs, and caused seizures, double vision, and pain. (*Id.* at 44.)  He has not held a driver's license for the past four years because of his seizures.  (*Id.* at 46.)

- He has trouble speaking, which gets worse as he gets tired.  (*Id.* at 45.)

- He has six to ten seizures a month, although a lot of them happen at night.  (*Id.* at 47.) He is taking seizure medication.  (*Id.*)  His medications make him very tired, but he is not able to sleep.  (*Id.* at 48.)  His pain medication affects his memory.  (*Id.*)  His doctors recommended surgery for his seizures, but he has not had them because he did not want to be a test case.  (*Id.* at 52-53.)

- On a typical day, he wakes up and eats a small breakfast.  (*Id.* at 48.)  He sits down and reads, then works on his physical therapy.  (*Id.*)  He spends a lot of time going downtown for his doctors' appointments and therapy.  (*Id.*)  He spends time at home by himself and the person he lives with.  (*Id.*)  He does not socialize much because his anxiety gets worse, he starts shaking and waddling, and feels very uncomfortable. (*Id.*)  He has friends that check on him every so often.  (*Id.*)

The VE testified DeLong had past work as a loan officer, financial service sales representative, and sales clerk.  (*Id.* at 55.)  The ALJ then posed the following hypothetical question:

[P]lease assume that he could perform lifting 20 pounds occasionally and 10 pounds frequently, as far as lifting, carrying, pushing, and pulling.  He could stand and walk for four hours out of an eight-hour workday, and he could sit for about six hours out of an eight-hour workday.  This gentleman would require a cane for uneven terrain, and this individual could occasionally climb ramps and stairs, cannot climb ladders, ropes, or scaffolds.  He could occasionally balance, stoop, kneel, crouch, or craw [sic].  And he is limited to no more than frequent handling, and fingering, or feeling with either upper extremity.  Okay.  And Ms. – I'm sorry, I'm going to strike that.  And in this example, it's going to be limited to handling, fingering, feeling no more than frequently with the right upper extremity. . . .  And so that's with the dominant upper extremity.  And

11

> then – excuse me.  His job duties cannot require verbal communication of more than a frequent basis.  He must avoid concentrated exposure to vibration, uneven terrain, and hazards such as unprotected heights, operation of hazardous machinery or equipment, and limited to no performing commercial driving.  This individual additionally can understand and remember two to three-step tasks.  He can carry out one to three-step tasks in a setting without demands for high – fast, unusually fast-pace or high production.  And he can interact with others on an occasional and superficial basis.  By superficial, I mean the job duties cannot require arbitration, negotiation, or conflict resolution, management or supervision of others or being responsible for the health, safety, or welfare of others.  And this person can adapt to occasional changes in a relatively static work setting.  Would that individual be able to perform any of Mr. DeLong's past work or any other work in the national economy?

(*Id.* at 56-57.)

The VE testified the hypothetical individual would not be able to perform DeLong's past work as a loan officer, financial service sales representative, and sales clerk.  (*Id.* at 57.)  The VE further testified no work would be available at the exertional level in the hypothetical.  (*Id.*)  The ALJ changed the exertional level to sedentary, and the VE testified the hypothetical individual could perform representative jobs in the national economy, such as sorter, assembler, and inspector.  (*Id.* at 58.)  The ALJ modified the hypothetical to occasional handling, fingering, and feeling with the dominant upper extremity.  (*Id.* at 59.) The VE testified that modification would eliminate all work.  (*Id.*)

### III.     STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

12

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 404.1520(g), 404.1560(c).

Here, DeLong was insured on his alleged disability onset date, April 14, 2014, and remained insured through December 31, 2019, his date last insured ("DLI"). (Tr. 15.) Therefore, in order to be

13

entitled to POD and DIB, DeLong must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2019.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of April 14, 2014 through his date last insured of December 31, 2019 (20 CFR 404.1571 *et seq*.).

3.    Through the date last insured, the claimant had the following severe impairments: epilepsy, cognitive impairment, cerebral ataxia, depressive disorder/mood disorder, anxiety, and obstructive sleep apnea (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently.  He can stand and walk for 4 hours of an 8-hour workday and he can sit for about 6 hours of an 8-hour workday.  He requires a cane for uneven terrain.  He can occasionally balance, stoop, kneel, crouch or crawl.  Handling, fingering, or feeling are limited to no more than frequently with the right upper extremity.  His job duties cannot require verbal communication on more than a frequent basis.  He must avoid concentrated exposure to vibration, uneven terrain, and hazards such as unprotected heights, operation of hazardous machinery or equipment, or performance of commercial driving.  He can understand and remember 2-3 step tasks.  He can carry out 1-3 step tasks in a setting without demands for unusually

14

fast pace or high production.  The claimant can interact with others on an occasional and superficial basis and "superficial" means the job duties cannot require arbitration, negotiation, conflict resolution; management or supervision of others; or being responsible for the health, safety, or welfare of others.  The claimant can adapt to occasional changes in a relatively static work setting.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on February **, 1976 and was 43 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant was not under a disability, as defined in the Social Security Act, at any time from April 14, 2014, the alleged onset date, through December 31, 2019, the date last insured (20 CFR 404.1520(g)).

(Tr. 17-32.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r*

*of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for

16

reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    The ALJ erred in evaluating Dr. Wax's opinion

DeLong argues the ALJ erred as he found consultative examiner Dr. Wax's opinion "somewhat persuasive" and the opinions of the state agency consultants "persuasive," and the regulations do not allow for a "sliding scale" of persuasiveness.  (Doc. No. 12 at 9.)  Having found both opinions persuasive, the ALJ was required to explain how he considered the "'other most persuasive factors'" under the regulations, and he did not do so here.  (*Id.*)  In addition, DeLong argues the ALJ erred in that the reasons

17

for finding the state agency consultants' opinions persuasive, and Dr. Wax's opinion unpersuasive, lack substantial evidence and are "not reasonable and/or logically bridged to the evidence."  (*Id.* at 10-13.)

The Commissioner responds that the substantial evidence supports the ALJ's mental RFC determination.  (Doc. No. 17 at 22-29.)

Since DeLong's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

18

evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

> (3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in

19

> paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1)).   A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Dr. Wax's opinion as follows:

> On July 30, 2018, the claimant attended a psychological consultative examination conducted by Mitchell Wax, Ph.D. The claimant reported that he was not able to work due to epilepsy. The claimant stated that he was taking Trileptal. The claimant had no significant behavioral health history. On examination, the claimant was dressed appropriately. He was pleasant and had good social skills. The claimant complained of memory problems, and intermittent memory problems were noted and his memory problems became worse as he tired. The claimant stated "I get tired quick now" and he said he had mini-seizures daily, "I get confused for a while after a mini- seizure." He also complained of speech problems of often having slurred speech. At times, word salad and word search problems were noted. His speech was initially logical, coherent, and goal directed. He did speak with slurred speech, and was asked to repeat himself several times when he was not understandable. He deteriorated as the session progressed due to fatigue. As he tired, word search problems and word salad problems became more evident and he was better apply to supply information to questions when queried. He appeared sad and a bit anxious. Hand tremors were noted. Based upon his daily functioning and his functioning during today's evaluation, the claimant appeared to be functioning in the "average" range of intelligence. He was administered the WAIS-IV intelligence test and the WMS-IV memory test. He obtained a full-scale IQ of 92, which is

20

in the average range of intelligence.  On his WMS-IV, all of his index scores
were in the "low average" range. During the evaluation, the claimant was
oriented as to person, place, time, and situation. There was evidence of mental
confusion, especially as he deteriorated due to fatigue. His ability to concentrate
was initially good, but became poor as he tired. His flow of conversation and
thought were marginal, due to significant speech problems. The claimant
claimed his speech problems were a result of his seizure disorder. On Digit
Span, he recalled eight digits forward and seven digits backward. He
remembered all three of three simple words on a recognition task after
approximately five minutes. He was able to add by 3s to 40 and subtract 7s from
100. Dr. Wax diagnosed cognitive disorder due to seizure disorder and
depressive disorder (5F).

Regarding the four work-related mental abilities, Dr. Wax expressed the
following medical opinion: (1) the claimant would be able to understand,
remember, and carry out instructions on a job based upon his average IQ
obtained on today's administered WAIS-IV intelligence test. He also has a BA
Degree and has worked at a high level job as an assistant manager at a bank. He
complained of currently having memory problems, and intermittent memory
problem were noted. He attributes his memory problems to his seizure disorder;
(2) the claimant would have difficulty maintaining attention and concentrating
on a job due to his intermittent memory problems. He stated he fatigues quickly,
and as he tires, he experiences cognitive problems. As he tired during the
evaluation, his speech became poor, and he had a poor ability to process
information. As he tired, his coordination also deteriorated. He stated, "I have to
do household chores in the morning, when I'm fresh"; (3) the claimant would
not have difficulty responding appropriately to supervisors and coworkers in a
work setting. Though he initially appeared pleasant and he had good social
skills, he did deteriorate as he tired. As he tired, he started making mistakes, and
did become frustrated. He has four friends and talks to them weekly. He also
has a close friend who is a neighbor that he talks to daily. He is close with his
children; and (4) the claimant would not respond appropriately to work
pressures in a work setting due to his quickness to fatigue. As he tires, his
cognitive problems become more pronounced (5F/8).

Dr. Wax's medical opinion is somewhat persuasive because he supported it with
explanations, his findings from the mental status examination, and his own
observations. However, his medical opinion is only somewhat persuasive
because of his reliance on fatigue from physical issues. Furthermore, his
medical opinion is only somewhat persuasive because it is not fully consistent

with the limited course of mental health treatment or the claimant's ability to live alone.

(Tr. 24-25.)

Elsewhere in the RFC analysis, the ALJ determined:

> While consultative examiner Dr. Wax noted intermittent memory problems and cognitive problems including mental confusion, no provider reported such problems (see examinations above by Dr. Alexopoulos, Ms. Laryea, Dr. Neme-Mercante, and Dr. Itin). The claimant was not psychiatrically hospitalized and there were no Emergency Department visits for acute psychiatric symptoms. Although the claimant took psychotropic medication at times, the claimant did not require or receive outpatient mental health services on a regular basis. From all of this, the undersigned finds that the claimant's symptoms and limitations were not as severe as alleged.

(*Id.* at 28.)

The ALJ analyzed the state agency reviewing psychologists' opinions as follows:

> Leslie Rudy, Ph.D., and Carl Tishler, Ph.D., reviewed the claimant's case file at the request of the State agency, the Division of Disability Determination Services, on August 15, 2018 and January 12, 2019, respectively. Both consultants expressed the following medical findings: the claimant is able to understand and remember 2-3 step tasks; is able to carry out 1-3 step tasks in a setting without demands for unusually fast pace or high production; is able to interact on an occasional and superficial basis; and he is able to adapt to occasional changes in a relatively static setting (1A and 3A).

> Their medical findings are persuasive because they are generally supported by the clinical findings/mental status examinations recounted above. Their medical findings are persuasive because they are consistent with the claimant's ability to live alone, fully participate in treatment, and the limited amount of outpatient mental health treatment.

(*Id.* at 29-30.)

The Court finds the ALJ erred in his evaluation of Dr. Wax's opinion.  First of all, DeLong testified that he lived with someone – therefore, he did not live alone at the time of the hearing.  (*Id.* at

22

48.)  When he did live alone, DeLong checked in with his neighbor daily, his neighbor sometimes helped him clean and grocery shop, and his neighbor did DeLong's laundry.  (*Id.* at 480.)  In addition, Dr. Wax noted DeLong "struggle[d] to live independently."  (*Id.* at 479.)  Nor does DeLong's ability to live alone undercut Dr. Wax's findings that memory problems were found on examination, that as DeLong tired he deteriorated cognitively, as demonstrated by word search problems, speaking word salad, and unintelligible speech, and that therefore he would have difficulty maintaining attention and concentration on the job, and he would not respond appropriately to work pressures in a work setting due to his quickness to fatigue.  (*Id.* at 480-81.)  Second, by discounting Dr. Wax's opinion on the grounds that he relied on fatigue from physical issues, the ALJ ignored Dr. Wax's findings above, as well as Dr. Wax's additional finding that as DeLong tired, "his cognitive problems become more pronounced."  (*Id.* at 481.)

By focusing on limited outpatient mental health treatment and fatigue from physical issues, it also appears the ALJ overlooked the impact DeLong's physical impairments, including his seizure disorder, had on his cognitive and mental impairments.  While the ALJ asserts no treatment providers noted cognitive and memory problems, citing to examinations by Drs. Alexopoulos, Neme-Mercante, and Itin, as well as PA-C Laryea, treatment providers found bulbar speech and drooling, some dys-articulation, mild to moderate dysarthric speech, and mild cognitive impairment.  (*Id.* at 490-91, 649, 651-52, 727, 752, 771, 774, 840.)    These examinations post-date the period of time DeLong had stopped his seizure medication for a few weeks to see what happened and because he was out of refills.  (Tr. 23-24, 469.)

Finally, the fact that DeLong "fully participated in treatment" likewise fails to undercut Dr. Wax's findings that that memory problems were found on examination, that as DeLong tired he deteriorated cognitively, as demonstrated by word search problems, speaking word salad, and unintelligible speech,

23

and that therefore he would have difficulty maintaining attention and concentration on the job, he would not respond appropriately to work pressures in a work setting due to his quickness to fatigue, and that as DeLong tired, "his cognitive problems become more pronounced." (*Id.* at 480-81.)

The ALJ credited the state agency reviewing psychologists' opinions on the flip side of the same grounds: they were "generally supported by the clinical findings/mental status examinations recounted above" and they were "consistent with the claimant's ability to live alone, fully participate in treatment, and the limited amount of outpatient mental health treatment." (*Id.* at 29-30.)

The ALJ therefore failed to build an accurate and logical bridge from his findings to his conclusions. *Fleischer*, 774 F. Supp. 2d at 877 (N.D. Ohio 2011).

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White*, 572 F.3d at 281; *Bowen*, 478 F.3d at 746 ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning. Here, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusions in his evaluation of Dr. Wax's opinion. As a result, the ALJ's decision must be VACATED AND REMANDED for proper articulation regarding this opinion.

As this matter is being remanded for further proceedings consistent with this opinion, and in the interests of judicial economy, the Court will not address DeLong's remaining assignment of error.

24

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is VACATED AND REMANDED for further consideration consistent with this opinion.

**IT IS SO ORDERED.**

Date: March 1, 2022                                   *s/ Jonathan Greenberg*
                                                     Jonathan D. Greenberg
                                                     United States Magistrate Judge